# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| HUNTSMAN INTERNATIONAL, LLC and HUNTSMAN HOLLAND B.V., | ) ) ) ) | C.A. No. N17C-11-242 MAA CCLD |
| Plaintiffs/Counterclaim Defendants, | ) ) ) | |
| v. | ) ) | |
| DOW BENELUX N.V. and THE DOW CHEMICAL COMPANY, | ) ) ) | |
| Defendants/Counterclaim Plaintiffs. | ) ) ) | |

Submitted: May 23, 2024
Decided: August 13, 2024

*Dow's Motion for Sanctions for Spoliation:*
**GRANTED**.

## OPINION

Lisa C. McLaughlin, Esquire, of PHILLIPS, MCLAUGHLIN & HALL, P.A., Wilmington, DE, and John N. Scholnick, Esquire (Argued), of ROSS, LLP, Los Angeles, CA, and Lori Sambol Brody, Esquire, of ELLIS GEORGE LLP, Los Angeles, CA, *Attorneys for Plaintiff/Counterclaim Defendants*.

Chad S. C. Stover, Esquire (Argued), of BARNES & THORNBURG LLP, Wilmington, DE, and Matthew B. Barr, Esquire, and Zachary Miller, Esquire, of BARNES & THORNBURG LLP, Indianapolis, IN, *Attorneys for Defendants/Counterclaim Plaintiffs*.

**Adams, J.**

1

Civil trials are not trials by surprise. This is especially true with complex commercial matters, where parties (and the lawyers who represent them) spend a significant amount of time and resources on the discovery process. Through the discovery process, adversaries obtain information regarding documents and other evidence for trial. By taking depositions, the parties also learn who will testify at trial and the substance of their testimony. Thus, when the time comes for trial, the parties generally know the universe of facts that will be presented.

This, of course, assumes that each side responds truthfully and fully to discovery requests and does not destroy evidence relevant to the case. Central to this case is the fact that Plaintiffs/Counterclaim Defendants, Huntsman International, LLC and Huntsman Holland B.V. (collectively, "Huntsman" or "Plaintiffs"), never issued a litigation hold notice regarding Defendants/Counterclaim Plaintiffs', Dow Benelux N.V. and The Dow Chemical Company (collectively, "Dow" or "Defendants"), Counterclaim. To this day, Huntsman has never issued a litigation hold relating to the Counterclaim. As a result, key databases were destroyed and unable to be restored. To make matters worse, Huntsman hid this fact from Dow and the Court. Dow subsequently filed a motion for sanctions for spoliation as a

result of Huntsman's conduct. For the following reasons, Dow's motion is **GRANTED.**[1]

## I. FACTUAL AND PROCEDURAL HISTORY

### A. The Original Complaint

This case has a long and torturous history, dating back to November 2017. The original dispute—and the multiple issues that have since spawned from it—arise out of an asset purchase agreement ("APA") between Huntsman and Dow.[2] Pursuant to the APA, Huntsman acquired assets of Dow's global ethyleneamines and aminoethylethanolamines business, except for Dow's ethyleneamines manufacturing plant in Terneuzen, Zeelandic Flanders, The Netherlands (the "Terneuzen Plant").[3]

The parties subsequently entered into an Amended and Restated Supply Agreement on November 15, 2001 (the "Agreement").[4] Pursuant to the Agreement, Dow would supply, and Huntsman would purchase, the ethyleneamines Dow produced at the Terneuzen Plant.[5] The Agreement provided that Huntsman has the right each year during the term of the Agreement to purchase from Dow up to 30

---

[1] During the hearing for the sanctions motion, the Court also heard oral arguments on Defendants' Motion to Strike Expert Report of Christopher Norek and Portions of Expert Report of Louis Dudney ("Motion to Strike") concurrently with the pending motion. The Court will issue an opinion as to the Motion to Strike in a separate decision.
[2] Compl. ¶ 10. (D.I. 1).
[3] *Id.*
[4] *Id.* ¶ 13.
[5] *Id.*

million pounds of ethyleneamines, which equaled fifty percent of the Terneuzen Plant's nameplate capacity for ethyleneamines.[6] The Agreement requires Dow to issue to Huntsman Holland an invoice for the product Dow delivered to Huntsman during that quarter.[7]

In January 2014, a barge owned by a third party crashed into a jetty at the Terneuzen facility.[8] Although Dow used that jetty to receive raw materials for use in activities related to the Terneuzen Plant, the barge that hit the jetty was not engaged in an activity related to the Agreement.[9] The parties vehemently dispute what happened next, but it is undisputed that during the fourth quarter of 2014 and the first and third quarters of 2015, Plaintiffs purchased and Dow delivered product and sent quarterly invoices to Huntsman.[10] In November 2015, Dow notified Huntsman about the barge accident by delivering to Huntsman three separate invoices, purporting to allocate and charge costs of the jetty repair to Huntsman.[11]

---

[6] *Id.* The term of the Agreement is 25 years from the Effective Date, which was February 9, 2001, unless terminated earlier in accordance with the provisions of Article 19 of the Agreement. *Id.* ¶ 14.

[7] *Id.* ¶ 15.

[8] *Id.* ¶ 17.

[9] *Id.*

[10] *Id.* ¶ 20.

[11] *Id.* ¶ 21.

After Huntsman refused to pay for the jetty repair, Dow sent a letter to Huntsman in November 2017 stating its intent to terminate the Agreement due to Huntsman's failure to pay the invoices related to the jetty.[12]

Huntsman filed a one-count claim for Declaratory Judgment, seeking a declaration that Huntsman was "not liable to Dow for payment of the 'jetty repair' invoices because the costs of the jetty repairs are not costs recoverable under the terms and conditions of the Agreement."[13] Dow moved to dismiss, and the Court denied the motion on October 3, 2018.[14]

## B.    Dow's Answer and Counterclaims

Dow answered the Complaint on May 20, 2019.[15] Huntsman then moved to amend the complaint to add claims for fraud, fraudulent concealment, breach of the implied covenant of good faith and fair dealing, and conversion on October 25, 2019.[16] The Court granted the motion on November 12, 2019 and Huntsman filed the First Amended Complaint on November 14, 2019.[17] Huntsman further sought to recover actual and punitive damages against Dow "for the costs Dow claims it

---

[12] *Id.* ¶ 24.
[13] *Id.* ¶ 28.  The First Amended Complaint contained numerous references to Dow's alleged fraudulent billing practices. *E.g.*, Am. Compl. ¶¶ 4, 5, 54.
[14] Memorandum Opinion, N17C-11-242 WCC CCLD, 2018 WL 4896668 (Del. Super. Oct. 3, 2018).  This action was previously assigned to Judge Carpenter.  The case was re-assigned to Judge Adams on August 19, 2022 in light of Judge Carpenter's impending retirement.
[15] D.I. 54.
[16] D.I. 60.
[17] D.I. 66, 67.

5

incurred in repairing the jetty."[18] Dow moved to dismiss the First Amended Complaint based on waiver, statute of limitations, and failure to state a claim, which the Court denied on February 2, 2021.[19]

Dow filed its Answer and Counterclaim on February 16, 2021.[20] Central to the Counterclaim is the requirement that Huntsman forecasts product in "good faith:"

> On or prior to the close of business on the fifth business day of each Quarter . . . Customer shall provide to Supplier a written forecast of the amount . . . and Product Slate of Product Customer intends to have Supplier produce and to purchase from Supplier . . . for each of the next four Quarters . . . The forecast for the third and fourth Quarters contained in each Product Forecast shall be a good faith estimate of the amount of Product and Product Slate Customer intends to have Supplier produce and to purchase from Supplier for each of such Quarters forecasted.[21]

Dow asserts that rather than engaging in good faith, Huntsman "repeatedly submitted bad-faith forecasts and then zeroed them out in later forecasts before they became binding."[22] These changed forecasts tied up Dow's product, and prevented Dow from finding alternative buyers for the products Dow produced and prepared for Huntsman based on Huntsman's bad faith forecasting.[23]

---

[18] D.I. 67, Am. Compl. ¶ 3.
[19] Memorandum Opinion, N17C-11-242 WCC CCLD, 2021 WL 509668 (Del. Super. Feb. 2, 2021).
[20] D.I. 105.
[21] Agreement, Article 7.1(c).
[22] Countercl. ¶ 1.
[23] *Id.* ¶ 53.

## C. Databases Used by Huntsman for Forecasting

Lauren Lozano currently serves as the Senior Manager for Planning and Fulfillment at Huntsman.[24]  Between 2016 and 2020, Ms. Lozano worked as Huntsman's Sales and Operation Planning manager for ethyleneamines.[25]  In that role, Ms. Lozano was the employee performing the analysis and making the recommendation for the forecasts of ethyleneamines from Dow's Terneuzen Plant.[26]  Ms. Lozano has been deposed twice for this case, once as the 30(b)(6) deponent regarding the ESI at issue in this motion ("Topic 4").[27]

Huntsman had a variety of tools that Ms. Lozano used to generate the firm and estimated Product Forecasts including ESOPT, IBP-A, GMIS, HSIMS, FuturCast,[28] Wave, and C4C.  The Court has compiled a detailed description of the databases and Huntsman's use of them based on the record as follows:

- FuturCast/GMIS/HSIMS:  FuturCast is a system that holds Huntsman's "historical forecast data, actual sales, and projected sales" for each

---

[24] Lozano Decl. ¶ 1.
[25] *Id.*
[26] *Id.*
[27] *Id.* ¶ 26 (quoting Topic 4 as "the timing and substance of Huntsman's efforts to preserve, identify, and produce ESI from ESOPT, [FuturCast], and/or Wave, when those platforms were decommissioned, and whether, when, and how forecast-related information in those platforms was deleted or destroyed; and the documents Huntsman has produced since the January 23, 2024 hearing.").
[28] The Court notes that this program is spelled in a variety of ways throughout the pleadings, briefing, affidavits, and exhibits.  For consistency, the Court will refer to it as "FuturCast" throughout.

Product for the following 12–18 months.[29]  GMIS was used until February 2018 when it was decommissioned and replaced by HSIMS—both programs are report-writing databases.[30]  Data from FuturCast was loaded into GMIS, then exported and loaded into HSIMS in 2018.[31]

- ESOPT/IBP-A:  Huntsman used ESOPT before 2018 and IBP-A after February 2018.[32]  ESOPT and IBP-A are sales and operations planning tools that permitted Ms. Lozano to see and manipulate graphical depictions of data pushed into from GMIS/HSIMS.[33]  Data "pushed into IBP-A were 'flat files:' (1) forecasting data from GMIS/HSIMS; (2) production capacity for the Freeport and Aminat plants; (3) data showing actual inventories; and (4) data showing forecast accuracy (a comparison of actual sales against the sales team forecasts) from GMIS/HSIMS."[34]

- WAVE/C4C:  Wave, a software program offered by McKinsey Consulting to track potential sales leads, "consisted of a compilation of notes and information about potential sales, coded depending on the potentiality of the sale; the highest three levels were entered into

---

[29] Lozano Decl. ¶ 3; Scholnick Decl. Ex. 28, at 26:16–27:2, 36:2–9, 37:5–12.
[30] Lozano Decl. ¶ 3; Denson Decl. ¶ 2.
[31] Lozano Decl. ¶ 3.
[32] Barr Decl. Ex. 31.
[33] Scholnick Decl. Ex. 28 at 26:16–27:2, 38:24–39:2; Lozano Decl. Ex. 1.
[34] Pls.' Opp'n at 5 (internal citations omitted); Lozano Decl. ¶¶ 2, 3.

8

GMIS/HSIMS for the sales forecast."[35]  Wave was replaced by C4C around late 2019/early 2020.[36]

- <u>Demand and Supply Reviews</u>:  The Supply Reviews contain screenshots of data from WAVE and IBP-A.[37]  The Supply Reviews also contain charts from IBP-A concerning inventory and supply forecasted in the future.[38]

According to Ms. Lozano, the data in the tools mentioned above "[are] just one thing" she takes into account in forecasting, as "forecasting is more than just looking at spreadsheets and at these tools."[39]  Ms. Lozano's "forecast recommendations" are also based on her "experience and discussions with other Huntsman employees concerning market conditions."[40]  Ms. Lozano further considered market conditions when making her forecasts based on "working knowledge [she] had as part of [her] role in the company."[41]

## D.  Meet and Confers Regarding Discovery at Issue for this Sanctions Motion

After the Court's October 2018 decision on the original motion to dismiss, the parties exchanged various discovery requests.  Relevant to this sanctions motion, in

---

[35] Pls.' Opp'n at 5 (internal citations omitted); Lozano Decl. ¶ 4.
[36] Pls.' Opp'n at 5 (internal citations omitted); Lozano Decl. ¶ 4.
[37] Scholnick Decl. Ex. 29, at 124:8–126:18; Ex. 17, at 3–4.
[38] *Id.*, Ex. 29, at 90:3–91:5, 124:8–126:18; Lozano Decl. ¶¶ 19–21; Exs. 2–4.
[39] Lozano Decl. ¶ 5.
[40] *Id.*
[41] Scholnick Decl. Ex. 28, at 76:2–19.

November 2019, Dow served its Second Set of Interrogatories upon Huntsman.[42]

These interrogatories included Interrogatory No. 15, which requested:

> Describe any and all methods You used to determine what amount of Product to take under the Agreement and the reasoning behind such methodologies and determinations.[43]

This interrogatory was not limited in time. On March 2, 2020, Huntsman refused to respond to Interrogatory No. 15, objecting to the interrogatory as not relevant, vague, ambiguous, overly broad, unduly burdensome, and oppressive.[44] Huntsman further objected on the grounds that the interrogatory sought "proprietary, confidential or trade secret information," and on attorney client privilege.[45]

---

[42] D.I. 62, Barr Decl. ¶ 3.

[43] Barr Decl. Ex. 1, at No. 15. Huntsman further argued at oral argument on May 23, 2024 (the "Sanctions Hearing") that "forecast" and "take" do not mean the same thing and that Dow's failure to clarify that "take" meant "forecasting" excuses Huntsman's failure to be on notice of the claim. The Sanctions Hearing Tr. [hereinafter "Tr."] 54:8–55:20. Dow quickly disputed this argument noting that Huntsman answered Interrogatory 15 "with forecasting practices and cited these databases that we're talking about today" indicating Huntsman "clearly interpreted it as asking for forecasting information because that's the information they provided in their response to the interrogatory." *Id.* at 65:5–16. The Court also noted that Interrogatory 15 was not limited as to time, either in the request itself or in the instructions. Huntsman did not object to the time frame in its response to the interrogatory, but limited its response in March 2023 to the 2016–2020 time frame; implicitly deciding a time limit. *Id.* at 64:14–65:1.

[44] Barr Decl. Ex. 1, at No. 15. In the Opposition, Huntsman stated that at the time, "the amount of product [Huntsman] requested was irrelevant to Huntsman's claims then at issue." Pls.' Opp'n at 14. This, of course, ignores the fact that *Huntsman's* belief as to relevance is not the standard. Discovery broadly allows for any non-privileged relevant material, regardless of admissibility at trial. Del. Super. Ct. Civ. R. 26(b)(1). The Court notes that "the threshold for relevance is not high." *Woodstock v. Wolf Creek Surgeons, P.A.*, 2017 WL 3727019, at *3 (Del. Super. Aug. 30, 2017). Evidence is relevant if "there is any possibility that the information sought may be relevant to the subject matter of the action." *Boatright v. State Farm Ins. Co.*, 2023 WL 8234528, at *2 (Del. Super. Nov. 28, 2023) (internal citations and quotations omitted). The Court decides the scope of discovery, including what is relevant, not the parties. *See, e.g.*, *Hiller v. Sedgwick Claims Mgmt. Servs., Inc.*, 2023 WL 107389, at *2 (Del. Super. Jan. 4, 2023) (internal citations omitted).

[45] Barr Decl. Ex. 1, at No. 15

On March 16, 2020, Dow's counsel sent Huntsman's counsel a discovery deficiency letter, whereby Dow requested Huntsman withdraw its objections and respond to Interrogatory No. 15.[46] The deficiency letter stated,

> Huntsman's response to these Interrogatories [No. 14 and 15], in which it apparently contends that its quarterly requests for product are not related to this case, rebut Huntsman's theory of broad overbilling. Huntsman's refusal to produce documents or answer questions relating to how much product it requested (and, therefore, how much it should have been billed) severely prejudices Dow's defense against Huntsman's new claims. Please either withdraw Huntsman's objections to these Interrogatories or withdraw the Unbounded Paragraphs in the First Amended Complaint, paragraphs 4–5, 53–55, 79, 81–83, 92–94, and 100–101.[47]

On February 19, 2021, Dow served Huntsman with its Third Set of Requests for Production.[48] This third set of requests included Request for Production No. 32 (seeking production of "[a]ll documents and communications related to Your need and/or requirements for ethyleneamines since 2000") and No. 33 (seeking production of "[a]ll communications, records, forecasts, projections, and other documents related to Your use and/or sale of the Product since 2000"). Huntsman objected to the requests and refused to produce documents in response to these requests.[49]

---

[46] *Id.*, Ex. 3.
[47] *Id.*
[48] D.I. 106.
[49] Barr Decl. Ex. 2.

On February 16, 2021, Dow filed its Answer and Counterclaim.[50] Dow's Fifth Affirmative Defense specifically mentioned the "bad-faith forecasts:"

> Plaintiffs' claims are barred by their prior breach of the implied covenant of good faith and fair dealing in the Agreement. Specifically, Plaintiffs violated the Agreement's specific implied obligation of good faith by submitting bad-faith forecasts and/or by zeroing out previously forecasted Product amounts as retribution against Dow for pursuing payment of invoices, to gain a competitive advantage, or otherwise in bad faith.

The very first sentence of the Counterclaim cuts right to the point: "This Counterclaim seeks to address Huntsman's acts of submitting bad-faith forecasts for amounts of ethyleneamines ("Product") that Huntsman claimed to intend to purchase from Dow."[51]

On May 14, 2021, after filing the Answer and Counterclaim, Dow's counsel sent another discovery deficiency letter to Huntsman's counsel regarding Huntsman's responses to the Third Requests for Production and Third Set of Interrogatories.[52] Dow stated with respect to Request Nos. 32 and 33:

> Huntsman's objections are incoherent and nonsensical. Dow's interrogatories and RFPs request information and documents highly relevant to Dow's Counterclaim, Huntsman's First Amended Complaint, and Dow's defenses. Huntsman's repeated statement that Dow's counterclaim is "baseless" and "was asserted only to harass and oppress Huntsman" is false. At their core, Huntsman's objections constitute attempts to argue the merits of Dow's Counterclaim in discovery responses. This is improper. Huntsman had the opportunity

---

[50] D.I. 105.
[51] Countercl. ¶ 1.
[52] Barr Decl. Ex. 4.

to file a motion to dismiss but replied to Dow's counterclaim instead. Huntsman must immediately provide and produce responsive information and documents relevant to Dow's Counterclaim. *See* Del. Super. Ct. R. 26(b)(1) ("Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party[.]").

. . .

**Huntsman's objections to producing documents related to its needs for, and uses of, ethyleneamines (Request Nos. 32 and 33):** Request No. 32 seeks all documents and communications related to Huntsman's need and/or requirements for ethyleneamines since 2000, and Request No. 33 seeks all documents related to Huntsman's use/sale of ethyleneamines since 2000. In addition to asserting form objections addressed above, Huntsman states it will not produce responsive documents. It objects to these requests based on relevance, stating the documents sought by the request are irrelevant because the request "asks for all documents concerning Huntsman's use of and world-wide requirements for ethyleneamines for a period of more than twenty years, including, but not limited to, Huntsman's own production of ethyleneamines, its uses, its customers, and market analyses."

Documents related to Huntsman's requirements for and uses of ethyleneamines are directly relevant to the allegations in Dow's Counterclaim—specifically, that Huntsman submitted to Dow forecasts for amounts of ethyleneamines that were not in good faith. In order to determine whether and how often Huntsman failed to submit forecasts to Dow in good faith, Dow is entitled to discover, among other things, the amount of ethyleneamines that Huntsman projected needing each quarter, how much it used, and how much it obtained from other sources, including itself.

Huntsman also objects that the "information requested – Huntsman's' [sic] worldwide customers, prices, markets, analyses – may constitute a violation of the antitrust laws." Yet, designating these documents as "Highly Confidential—Attorneys' Eyes Only" under the Protective Order would avoid any such concerns. Indeed, that was Huntsman's

13

position during negotiations of the Protective Order, so Huntsman's contradictory objection now is puzzling. Please withdraw your objections and fully respond to Request No. 32.[53]

Dow further stated with respect to Interrogatory Nos. 14–15:

These interrogatories, respectively, ask Huntsman to identify and describe any communications or documents relating to Huntsman's elections to take Product under the Agreement, and to describe all methods Huntsman used to determine how much Product to take under the Agreement and the reasoning behind such methodologies and determinations. Huntsman objected to these interrogatories based on relevance. Given the filing of Dow's Counterclaim, Huntsman's relevance and other objections have no basis. Please withdraw your objections and fully supplement your written answers.[54]

In response to Dow's May 14, 2021 letter, Huntsman agreed to supplement its response to Interrogatory No. 15, and expressed a willingness to produce documents (on a narrower basis) responsive to RFP Nos. 32 and 33.[55] Dow narrowed its scope in a July 7, 2021 letter, clarifying that

it seeks documents and communications related to how much ethyleneamines Huntsman projected it would need for all quarters from 2011 to the present and documents and communications sufficient to show where and how Huntsman planned to source the needed ethyleneamines. Dow, however, has not seen Huntsman's documents and has no knowledge of Huntsman's internal operations. Dow thus requests that Huntsman identify, as part of the meet-and-confer process, the categories of documents Huntsman submits would show the information Dow is seeking in Request Nos. 32 and 33.[56]

---

[53] *Id.*
[54] *Id.*
[55] *Id.*, Ex. 5.
[56] *Id.*, Ex. 6.

14

Huntsman responded to Dow's July 7, 2021 letter on August 18, 2021.[57] Huntsman continued to object to RFP Nos. 32 and 33 as overbroad and stated that "it will produce forecast letters, to the extent that they are available, for the length of the contract, and internal communications relating to forecasting product from Terneuzen from November 2015 on . . . ."[58] Dow's counsel responded to Huntsman's August 18 letter, explaining what Dow believed to be the relevance of the documents sought by RFPs No. 32 and 33:

> It is critical to Dow's counterclaim to understand Huntsman's decision making process when forecasting Product amounts to Dow. If Huntsman chose to forecast amounts of Product to Dow while knowing it planned to source Product for those quarters from other sources, those forecasts would have been made in bad faith.[59]

After several further meet and confers, Dow moved to compel, among other things, Huntsman to supplement its answer to Interrogatory No. 15 on January 18, 2022.[60] After a hearing on the motion to compel, the parties continued to attempt to negotiate a resolution without further Court action.[61] This attempt, however, was short-lived, and the Court heard oral argument on January 25, 2023 regarding

---

[57] *Id.*, Ex. 7.
[58] *Id.*
[59] *Id.*, Ex. 8.
[60] D.I. 139.
[61] D.I. 153. As previously indicated, on August 19, 2022, this action was re-assigned to Judge Adams. D.I. 157.

additional motions to compel.[62]  During the hearing, the Court, among other things, ordered Huntsman to supplement its answer to Interrogatory No. 15 within 30 days.[63]

Huntsman served its supplemental responses to Dow's Second Set of Interrogatories on March 7, 2023.[64]  In doing so, Huntsman provided a high-level description of what Huntsman employee Lauren Lozano would typically review when preparing the forecasts of Product to Dow, including data from software programs called "FuturCast" and "ESOPT."[65]  Dow subsequently served RFP No. 78 on May 25, 2023,[66] requesting Huntsman produce:

> All Documents referenced in Huntsman's Supplemental Response to Interrogatory No. 15 that Huntsman considered, read, reviewed, evaluated, discussed, analyzed, or relied upon in determining how much Product to include in its Product Forecasts (including its Firm Order Forecasts or Good Faith Forecasts) from January 1, 2015 through 2020 . . . ."[67]

Huntsman responded to RFP No. 78 on June 26, 2023 as follows:

> Huntsman has produced responsive, non-privileged documents from 2015 through 2020 that were considered or relied upon for the purpose of determining how much Product to include in its quarterly forecasts, including, *e.g.*, documents identified by Bates ranges in Exhibit B to

---

[62] D.I. 185.
[63] Barr. Decl. ¶ 16.
[64] *Id.*, Ex. 9.
[65] *Id.*  FuturCast is "a system that held historical forecast data, actual sales, and projected sales[.]" Scholnick Decl. ¶ 18.  "FuturCast data is exported into GMIS/HSIMS to generate reports."  *Id.* Ms. Lozano is the Huntsman employee responsible for performing the analysis for determining the "firm" and estimated forecasts of Product from Terneuzen.  *Id.*, Ex. 28, at 20:20–21:3, 24:1–26:8.
[66] D.I. 199.
[67] Barr Decl. Ex. 10.

Huntsman's Supplemental Responses and Objections to Dow's Second Set of Interrogatories, dated March 7, 2023.[68]

Importantly, Huntsman did not indicate that it withheld any responsive documents.[69] The Court details the timing and contents of these discovery matters to indicate Huntsman's knowledge of the information requested, and concurrent failure to inform Dow of the destruction of the databases, and failure to attempt to recover the relevant destroyed data until after the motion to compel hearing requiring disclosure.

## E.     The 30(b)(6) Depositions Regarding Huntsman's Efforts to Preserve

Dow deposed Huntsman employee Lauren Lozano on September 20, 2023.[70] During Ms. Lozano's deposition, Dow learned for the first time that one of the forecasting tools, ESOPT, was decommissioned sometime during the pandemic.[71] Ms. Lozano further testified that she could not remember the exact date ESOPT became decommissioned, did not know if there was an archive of what was in ESOPT, and that ESOPT was not replaced with anything else.[72]

On October 4, 2023, counsel for Dow demanded the production of materials that Ms. Lozano testified about concerning ESOPT, FuturCast, and Wave that

---

[68] *Id.*
[69] Barr Decl. ¶ 20.
[70] *Id.*, Ex. 28.
[71] *Id.* at 39:15–40:9.  Ms. Lozano confirmed in her declaration that on September 14, 2021 she informed her IT specialist that she "[c]an confirm that we are no longer using IBP-A and we do not need the data in the system maintained *for any reason*."  Lozano Decl. ¶ 32; Ex. 9 (emphasis added).
[72] Barr Decl. Ex. 28, at 39:15–40:9.

Huntsman had not produced.[73]  Huntsman's counsel never responded in writing to this request.[74]  It appears from Ms. Lozano's Declaration submitted in opposition to the sanctions motion that sometime in October 2023—after Ms. Lozano's deposition—she first began her attempt "to find the underlying data inputs that would be pushed into IBP-A which [she] reviewed in making [her] forecasting recommendations."[75]

On October 5, 2023, Dow's counsel then requested dates for a Rule 30(b)(6) deposition of Huntsman regarding, among other things, Huntsman's ethyleneamines sales and the timing and substance of Huntsman's efforts to preserve, identify, and produce responsive ESI.[76]  Dow's request included specifically a person with knowledge to testify about "Huntsman's efforts to preserve, identify, and produce ESI from ESOPT, [FuturCast], and/or Wave, when those platforms were decommissioned, and whether, when, and how forecast-related information in those platforms was deleted or destroyed" ("Topic No. 4").[77]  Huntsman objected to Dow's request to produce a person with knowledge regarding ESI on the grounds that

> it is premature as Huntsman is undertaking efforts to recover and/or locate the ESI from its ESOPT, [FuturCast], and/or Wave platforms. Deposing the multiple persons with knowledge concerning these subjects is therefore unnecessary until Huntsman makes its

---

[73] Barr Decl. ¶ 21; Ex. 11.
[74] Barr Decl. ¶ 21.
[75] Lozano Decl. ¶ 6.  Ms. Lozano's attempts to find the missing data are detailed in her declaration at ¶¶ 7–15.
[76] Barr Decl. Exs. 12, 13.
[77] *Id.*, Ex. 12.

determination as to whether it will be able to produce such data, at which time the parties can determine whether a deposition on this topic is necessary.[78]

On November 16, 2023, lead counsel for Dow, Matthew Barr, and lead counsel for Huntsman, John Scholnick, met in person to discuss Huntsman's objection to the deposition.[79] During this meet and confer, "Mr. Scholnick indicated that Huntsman may recover and produce some materials from ESOPT, FuturCast, and Wave, but he gave no timetable for producing them."[80] Dow's counsel continued to request that Huntsman produce a witness on Topic No. 4, with each time Huntsman's counsel refusing such requests.[81] Dow subsequently moved to compel on the issue.[82]

The Court heard oral argument on January 23, 2024 on Topic No. 4, along with other issues raised by both parties.[83] Among other things, the Court ordered Huntsman to produce a witness on Topic No. 4 by March 1, 2024 and further ordered Huntsman to produce the documents at issue in Topic No. 4 "by the end of the week."[84]

---

[78] *Id.*, Ex. 15.
[79] Barr Decl. ¶ 28.
[80] *Id.*
[81] *Id.* ¶¶ 29–32.
[82] *Id.* ¶ 33; D.I. 257.
[83] D.I. 276. On January 23, 2024, January 29, 2024, February 1, 2024, and February 21, 2024, Huntsman produced data from Wave/C4C for the time period of April 13, 2016 to January 19, 2018. Scholnick Decl. ¶¶ 37–38.
[84] Barr Decl. ¶ 34.

Huntsman produced 28 documents by the Court-ordered deadline of January 26, 2024.[85] Huntsman then produced three additional documents on January 30, 2024 and 256 additional documents on February 1, 2024.[86] This prompted Dow to serve its First Amended Notice of Rule 30(b)(6) Deposition with an amended Topic No. 4:

> The timing and substance of Huntsman's efforts to preserve, identify, and produce responsive ESI from its computers, servers, networks, and electronic systems and devices, including, but not limited to, the timing and substance of Huntsman's efforts to preserve, identify, and produce ESI from ESOPT, [FuturCast], and/or Wave, when those platforms were decommissioned, and whether, when, and how forecast-related information in those platforms was deleted or destroyed; and the documents Huntsman has produced since the January 23, 2024 hearing.[87]

On February 20, 2024, Dow deposed Ms. Lozano as Huntsman's corporate representative to testify "when [the] platforms were decommissioned, and whether, when, and how forecast-related information in those platforms was deleted or

---

[85] *Id.* ¶ 35. The documents produced were part of Huntsman's efforts to obtain the data inputs to IBP-A. These documents from Aminat "show[] the monthly actual and planned production monthly from 2016 to 2019 . . . and data from Freeport that shows the monthly actual and planned production from 2016 to 2024." Scholnick Decl. ¶ 28. Actual inventory had been "found" by Huntsman as of the date of Scholnick's Declaration, on April 26, 2024, but had not been produced and would "be produced to Dow shortly." *Id.* ¶ 30. The Court is unclear on exactly when the actual inventory was turned over, but 58 additional documents were provided on April 29, 2024, and Scholnick represented at oral argument that all documents had been turned over as of that date, on May 23, 2024, so the Court assumes the actual inventory was produced on the April 29, 2024 date. *See* Tr. 45:11–20. Further, "a spreadsheet for actual inventory generated from HSIMS which contained information starting in 2018" was produced on approximately January 26, 2024. Scholnick Decl. ¶ 31.

[86] Barr Decl. ¶ 36.

[87] *Id.*, Ex. 19.

destroyed; and the documents Huntsman has produced since the January 23, 2024 hearing."[88]  During Ms. Lozano's February 20, 2024 deposition, Ms. Lozano testified that Huntsman's destruction of documents was far broader than previously indicated, including the loss of data from more than just ESOPT.[89]

During the deposition, Ms. Lozano testified about the history of Huntsman's Internal Forecasting Data, and what, if anything, could still be accessed.[90]  Ms. Lozano testified that Huntsman's Internal Forecasting Data was stored in FuturCast, among other databases.[91]  FuturCast then fed data into GMIS, and once GMIS was not used anymore, the data was fed into HSIMS.[92]  Although FuturCast is still accessible by Huntsman, the database automatically deletes data that is over four years old.[93]  As confirmed during the Sanctions Hearing, Huntsman made no effort

---

[88] Barr Decl. ¶¶ 39–40.

[89] Barr Decl. Ex. 30, at 54:14–55:18.

[90] The Court has endeavored to figure out the information from the databases that Huntsman recovered.  Suffice it to say that Huntsman admits it has not been able to recover all information that was lost.  *See, e.g.*, *id.* at 55:17–18 ("We have a limited history."); Tr. 43:12–15 ("We took a look at it and it was a snapshot at a point in time just before the decommissioning of the IBP-A in September of 2021.  So it was not particularly helpful."); 49:4–11 ("It can't look at visually what [Ms. Lozano] looked at because she looked at this tool, IBP-A, and she was able to have this information on screen showing whatever graphical representation she needed to kind of play around with in order to utilize her skills to make recommendations.  That's what's – that's the only thing that's missing.").

[91] Barr Decl. Ex. 30, at 54:19–55:18.

[92] *Id.* at 24:4–17.  Ms. Lozano testified she did not know what GMIS or HSIMS stood for.  *Id.* at 24:18–22.

[93] *Id.* at 25:11–15; 30:17–31:1.  During the Sanctions Hearing, counsel for Huntsman did not rebut Dow's argument that the auto deletion was never stopped.  Huntsman's counsel did confirm that as of the date of the Sanctions Hearing, there still had been no litigation hold with respect to the Counterclaim.  Tr. 34:7–11.

to preserve or back up data in FuturCast until 2024.[94]  Therefore, all data from the relevant 2016–2020 time period has been permanently deleted from FuturCast.[95]

FuturCast data was also deleted from two other sources, GMIS and HSMIS. Huntsman decommissioned and deleted GMIS in December 2021.[96]  There is no FuturCast data in GMIS.[97]  HSMIS, although still an active database, also automatically deletes four-year-old data.[98]  Thus, all data from the relevant 2016–

---

[94] Barr Decl. Ex. 30, at 31:2–5; 36:13–39:10 (indicating that the data recovered from FuturCast that was loaded into GMIS was first produced in March 29, 2024); 44:16–45:9 (noting that the information produced from Wave in February 2024 was produced so late because "we didn't start to look for any of this, the kind of underlying raw data until we were convinced that we couldn't find it").

[95] *Id.* at 31:2–12; 54:19–55:18; *id.*, Ex. 31 ("FuturCast – data retained for 48 months; data can be pulled from 2/2020; data prior to that is automatically deleted").

[96] *Id.*, Ex. 31 ("12/17/2021 – Huntsman initiates decommission of GMIS, expects completion by 12/31/2021.  Not retaining any data from GMIS except parts of GMIS (PNL and customer profitability) were saved in Planning Analytics").  Huntsman made no effort to preserve the data in GMIS.  *Id.*, Ex. 30, at 31:2–6.  Huntsman subsequently found FuturCast/GMIS raw data from January 2015 to December 2017.  Scholnick Decl. ¶ 22.  On March 29, 2024, Huntsman produced this "raw" data.  Denson Decl. ¶¶ 3–9.  "This raw data was contained in text files and contains information including the date the data was loaded, forecast projections for 23 months, the customer code, the material code, and the forecast volume.  The data includes all Huntsman products, including ethyleneamines.  The data does not contain names of customers or of the homologue; Huntsman provided a 'key' that matched up customer and product names with the codes such that, if the data were pasted into Excel and a LOOKUP function used, the names of the customers and products could be viewed.  This would permit Dow to look at forecasting data 6–9 months out, as it desires."  Scholnick Decl. ¶ 22 (internal citations omitted).  Huntsman's counsel also took steps to take this raw data and create spreadsheets and tables for Dow.  *Id.* ¶¶ 22–25.

[97] Barr. Decl. Ex. 30, at 28:16–20.

[98] *Id.* at 29:2–30:10  (testifying that Huntsman did not suspend the auto-delete for HSIMS).

2020 time period has been deleted from HSMIS.[99] Huntsman's counters that its duty to preserve "arose on February 16, 2021 when [the] counterclaim [was] filed."[100]

Huntsman Internal Forecasting Data was also stored, and deleted from, the ESOPT database.[101] In 2018, Huntsman deleted ESOPT and the daily backups of its data and migrated its data to IBP-A.[102] Because Huntsman migrated ESOPT's data to IBP-A, in February 2019, IBP-A held forecasting data back to February 2017.[103] IBP-A, however, automatically deleted two-year data.[104] While Huntsman created daily backups on its servers, IBP-A and its backups were deleted by Huntsman in Q4, 2021.[105] Ms. Lozano personally approved the deletion of IBP-A and its backup on September 14, 2021.[106] Huntsman, again, argues that its duty to preserve did not

---

[99] *Id.* at 54:19–55:18; *id.*, Ex. 31 ("HSIMS – data only goes back to 2020"). The Court notes that on August 31, 2022, Huntsman produced 600 forecasting documents from Ms. Lozano's files. Scholnick Decl. ¶ 16. "These forecasting documents included Supply and Demand Reviews, spreadsheets, and other presentation material concerning Terneuzen forecasts." *Id.* Neither party addressed these disclosures at the Sanctions Hearing.

[100] Scholnick Decl. Ex. 32, at 1. Huntsman argues that "[h]ad 4-year autodelete function been turned off, would have had data since February 2017 only, and no data prior to that date (January 2016 to January 2017)." *Id.* On April 19, 2024, Huntsman produced forecasted sales data from HSIMS from 2018–2020 that shows forecasts for 23 months out. Denson Decl. ¶ 10; Lozano Decl. ¶¶ 11, 24; Tr. 41:9–13.

[101] ESOPT had a two year auto delete functionality. Barr Decl. Ex. 30, at 33:6–19. Huntsman counters that ESOPT data was deleted, arguing that "all ESOPT data was migrated into IBP-A." Scholnick Decl. Ex. 32, at 1. While true that ESOPT data was migrated into IBP-A, this does not change the fact that ESOPT had a two year auto-delete functionality that was not suspended. Barr Decl. Ex. 30, at 33:4–13. This argument also ignores the fact that IBP-A data (including data migrated from ESOPT) was deleted in Q4 2021. *Id.* at 35:17–37:1

[102] Barr Decl. Ex. 30, at 32:6–12, 34:15–21.

[103] *Id.* at 35:17–36:2.

[104] *Id.* at 34:1–36:16.

[105] *Id.* at 36:3–16.

[106] *Id.*, Ex. 31 ("9/14/2021 – Lauren Lozano says IBP-A is no longer being used and data doesn't need to be maintained.").

23

begin until February 16, 2021 when the Counterclaim was filed—notably *before* the IBP-A data was deleted.[107]

Finally, Huntsman Internal Forecasting Data was stored in Wave.  Huntsman kept data in Wave until 2018 or 2019, and then stored it in a "C4C" database.[108] Huntsman decommissioned Wave in June 2022.[109]  Although some Wava data was stored on Huntsman's SharePoint site, called "the Hub," Ms. Lozano could not find any relevant data stored there.[110]  Nonetheless, on January 23, 29, February 1, and 21, 2024, Huntsman produced Wave data from April 2016 to January 2018.[111]

---

[107] In response to the Barr Declaration that IBP-A data was deleted, Huntsman's counsel averred that "Huntsman has produced or will produce" certain documents.  Scholnick Decl. Ex. 32, at 2. Scholnick details these productions in several bullet points.  The Court has endeavored to identify which of these bullet points were produced when, and the best it has been able to do is identify the following: HUNTSMAN21233 and HUNTSMAN21236 were produced on approximately January 26, 2024 (Scholnick Decl. ¶ 28); HUNTSMAN21234 was produced on approximately January 26, 2024 (*Id.* ¶ 31); HUNTSMAN21235 was produced on approximately January 26, 2024 (*Id.* ¶ 34); HUNTSMAN22082–22189 was produced on March 29, 2024 (*Id.* ¶ 11); HUNTSMAN22193– 22194 were produced on April 19, 2024 (*Id.* ¶ 25).  Several other items are listed without identification in Exhibit 32 so the Court is unable to identify precisely when these documents were produced, if they were produced as described by Scholnick as "will [be] produce[d]" in Exhibit 32.

[108] Barr Decl. Ex. 30, at 41:9–42:7.

[109] *Id.* at 22:6–14 (testifying that Kimberly Matthews approved the decommission of the Wave tool); 44:19–45:14 ("If the time period passed and the Wave was no longer relevant, it would [have] been removed.").  The parties only provided the Court with excerpts from depositions, so the Court was unable to identify who Kimberly Matthews is based on the exhibits provided.  To the extent it matters, the Court assumes Ms. Matthews is someone with the authority to authorize the decommission of a tool Huntsman was using.  The parties did not present otherwise at any point.

[110] *Id.* at 97:10–98:3.

[111] Scholnick Decl. Ex. 32, at 4; Scholnick Decl. ¶ 37.  Huntsman further argues that because the duty to preserve did not begin until February 16, 2021, there was no obligation to preserve prior to that time.  *Id.*, Ex. 32, at 4.  Additionally, "Wave was no longer used by 2019/2020." *Id.*

24

In sum, Ms. Lozano confirmed during her deposition that Huntsman was unable to obtain documents out of ESOPT, FuturCast, GMIS, HSIMS, or Wave related to the relevant time period.[112] Ms. Lozano confirmed that the information Huntsman obtained was a "limited history," and instead Huntsman produced partial information it obtained from sources other than the databases themselves.[113] Put simply, Huntsman did not preserve relevant documents necessary for Dow to determine whether Huntsman's internal forecast data from 2016–2020 contradicted Huntsman's forecasts to Dow.[114]

On February 21, 2024, one day after Ms. Lozano's deposition, Huntsman produced an additional 97 documents.[115] Huntsman represented in its production of these documents that they were "parts of the deleted data" from Wave, but Dow criticized that "without the ability to depose someone on these documents and get into that level of detail, it's really difficult to tell."[116] Some of the documents were spreadsheets, and other documents were limited data files that would need to be run through particular formulas to identify.[117]

---

[112] Barr Decl. Ex. 30, at 54:19–55:2.

[113] *Id.* at 55:3–19.

[114] *Id.* at 79:25–81:5. Huntsman likewise did not preserve the product forecasts that Ms. Lozano manually input into the ESOPT and IBP-A systems. *Id.* at 93:4–23. Huntsman then used the manual inputs to create "scenario plan[s]" from a sales and production perspective. *Id.*, Ex. 28, at 67:9–68:10.

[115] Barr Decl. ¶ 40.

[116] Tr. 20:7–14; 48:1–12.

[117] *Id.* at 20:15–21:12.

On February 27, 2024, Dow deposed Huntsman's General Counsel, David Stryker, as Huntsman's corporate representative to testify about Huntsman's efforts to preserve, identify, and produce responsive ESI.[118] Mr. Stryker testified that the only litigation hold notices Huntsman sent out were litigation hold notices for its own affirmative claims.[119]

Huntsman never sent out a litigation hold after Dow filed its Counterclaim. In fact, Huntsman has never sent out a litigation hold regarding Dow's Counterclaim.[120] Mr. Stryker testified:

> When the counterclaim came in, we did not look at the counterclaim and ask whether additional custodians [were] required to be identified or additional documents [were] required to be preserved. Had we done that, I wouldn't be sitting here today.[121]

---

[118] Barr Decl. ¶¶ 39–41; *id.*, Ex. 21.

[119] *Id.*, Exs. 33, 34, and 32, at 35:14–17. Both hold notices provided a "Description of Matter" that only described Huntsman's claim for reimbursement of repair costs for the jetty accident at the Terneuzen plant. *Id.*, Ex. 33, at 1; Ex. 34, at 1. Mr. Stryker further testified that custodians who received the two litigation hold notices were required to "acknowledge" it by answering a questionnaire at a link in the notice. *Id.*, Ex. 33, at 2–3; Ex. 34, at 3; Ex. 32, at 29:21–31:16. Huntsman's attorneys were required to follow up with custodians who did not fill out the acknowledgement questionnaire to ensure it was completed. *Id.*, Ex. 32, at 49:2–51:22. Several of the litigation holds, however, were never acknowledged by their custodian; therefore, the custodian likely did not preserve all relevant documents they may have had. *Id.* at 55:17–23. Huntsman avers, however, that certain of the custodians did produce relevant documents even though they did not formally acknowledge the litigation hold letter. Scholnick Decl. ¶ 2.

[120] Tr. 34:9–11.

[121] Barr Decl. Ex. 32, at 92:4–9.

Mr. Stryker agreed that a litigation hold should have been sent out for the Counterclaim "[b]ecause the counterclaim was unrelated in material respects to the original claim[.]"[122]

Mr. Stryker confirmed Huntsman had a process for preserving internal databases, including those that had an auto-delete function.[123] Although not every database had the ability to over-ride an auto-delete function, Huntsman had the ability to pull the data from the database manually.[124] For example, if a discovery request came in, Mr. Stryker could ask an employee "to pull a bunch of records" to make sure that the data is "preserved, pulled, culled, collected, or otherwise aggregated."[125] Mr. Stryker confirmed Huntsman failed to send out litigation hold notices out for Forecasting Data in FuturCast, ESOPT, and Wave.[126]

Following Mr. Stryker's deposition, Dow sent a letter to Huntsman's counsel requesting additional documents related to Huntsman's efforts to preserve, identity, and produce responsive ESI.[127] The parties exchanged meet and confer letters on the issue, and Huntsman refused to produce the documents referenced in Mr.

---

[122] *Id.* at 35:18–36:24. ("[T]he folks responsible for [sending out the litigation hold] made a mistake and didn't have one sent out.").

[123] According to Huntsman's Opposition, the ESI at issue was deleted as part of Huntsman's regular decommission process, and not as part of an intentional act to destroy relevant ESI. Pls.' Opp'n at 9–11.

[124] Barr Decl. Ex. 32, at 122:15–123:18.

[125] *Id.*

[126] *Id.* at 145:18–23. "[W]e didn't get hold notices out for these particular tools, which as I said and I'll stand up in court and say it was a mistake for which I am sorry."

[127] Barr Decl. ¶ 41; *id.*, Ex. 21.

Stryker's deposition related to Huntsman's efforts to preserve, identify, and produce responsive ESI.[128]  Huntsman subsequently backtracked on this refusal and sent an email to Dow's counsel on March 27, 2024 stating that it "intend[ed] to produce additional documents/data from TotalDiscovery . . . pursuant to the limited waiver of the attorney client privilege and work product doctrine.  We will produce these documents as soon as possible."[129]  As of Barr's Declaration on March 28, 2024, Dow had not received these additional documents.[130]  The parties agree there were at least three more dates of production from Huntsman since March 28, 2024, but neither party identified in briefing or at the Sanctions Hearing whether these particular documents were ever produced on any of those dates.

**F.     Huntsman's Efforts to Produce Relevant ESI after 30(b)(6) Depositions**

According to Huntsman, after Huntsman "learn[ed] of the decommissioned ESI, Huntsman undertook extensive efforts to recreate the underlying documents and/or resurrect the decommissioned systems so the data could be produced to Dow."[131]  Huntsman's efforts for each of the databases was described as follows:

- IBP-A: "[S]ince a snapshot of data had been archived, albeit unreadable without the software, Huntsman obtained from Oliver Wight a renewal

---

[128] Barr Decl. ¶ 42; *id.*, Ex. 22.
[129] Barr Decl. ¶ 42; *id.*, Exs. 21, 22.  TotalDiscovery is the software system Huntsman uses to automate its litigation hold process.  *Id.*, Ex. 32, at 34:20–25.
[130] Barr. Decl. ¶ 42.
[131] Pls.' Opp'n at 11.

of the IBP-A license, which allowed Huntsman to view but not download the archived data."[132] Huntsman found the following inputs that were uploaded into IBP-A and used for forecasting:

○ GMIS/HSIMS forecasted sales data from 2016 to 2020;

○ Freeport and Aminat actual and forecasted production from 2016 to 2020;

○ Product inventory data;

○ Forecast accuracy data from HSIMS from 2018 to 2020, along with a formula for calculating forecast accuracy; and

○ Supply Reviews from June 2018 to December 2020.[133]

○ Lozano's manual line item inserts into IBP-A concerning Terneuzen were not recovered.[134]

- WAVE: "Huntsman's investigation could not find backup WAVE data, although other WAVE/C4C data was found in the files of Huntsman employees and produced to Dow.[135]

- Extracts from WAVE that were found consisted of "a complete set of WAVE initiatives from April 13, 2016 to January 19, 2018."[136]

---

[132] *Id.* at 11–12.
[133] *Id.* at 12.
[134] *Id.*
[135] *Id.* at 13.
[136] *Id.*

Huntsman further argues that Huntsman produced "internal emails concerning the forecasting process," including "[m]ore than 600 forecasting documents . . . from Lozano's files."[137]

Dow provided a helpful chart regarding a timeline of Huntsman's deletion of internal forecasting data:[138]

---

[137] *Id.* at 16.

[138] Defs.' Br. at 25. The Court notes Huntsman's disagreement with the characterization of the deletion of *all* the data from these data sources and considers the entire record for what precisely was deleted and when. *See, e.g.*, Tr. 35:13–22. This chart is a helpful illustration, not the entirety of the Court's considerations.



## II. PROCEDURAL HISTORY

On March 28, 2024, Dow filed its Motion for Sanctions.[139] Huntsman filed

its Answering Brief in Opposition to the Motion for Sanctions on April 26, 2024.[140]

In support of its Answering Brief, Huntsman filed six declarations from Huntsman

employees: Lauren Lozano, Allison McCurdy, Noah Denson, Twila Day, Peter Van

---

[139] D.I. 308.
[140] D.I. 317.

Rinsum, and Shawn Bates.[141]  Prior to filing the Opposition, Huntsman never mentioned Allison McCurdy or Twila Day as potential custodians or individuals with relevant information.[142]  Dow filed its Reply in Support of its Motion for Sanctions and Spoliation on May 10, 2024.[143]  The Court heard oral argument on May 23, 2024 and took the matter under advisement.

## III.   STANDARD OF REVIEW

Delaware Superior Court Rule of Civil Procedure 37(b)(2)(F) governs the Court's analysis on a motion for sanctions arising from spoliation of electronically stored information.  Rule 37(b)(2)(F) states:[144]

> *Rule 37.  Failure to preserve ESI*.  If ESI that should have been preserved in the reasonable anticipation of or actual notice of imminent litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted recklessly or with the intent to deprive another party of the information's use in

---

[141] D.I. 317.

[142] Defs.' Reply at 4.

[143] D.I. 331.

[144] Superior Court Civil Rule 37(b)(2)(F), Court of Chancery Rule 37(e), and Federal Rules of Civil Procedure Rule 37(e) are all substantially similar.  The Court notes that the Chancery Rule 37(e) does not include part (B) of 37(e)(2); this is because there are no jury trials in the Court of Chancery.  Thus, all applicable provisions are the same between the Court of Chancery and the Superior Court.  It is therefore appropriate for the Court to consider decisions from the Superior Court, the Court of Chancery, and all Federal Courts for its analysis. *See Goldstein v. Denner*, 310 A.3d 548, 568 (Del. Ch. 2024).

litigation, may, among other things: (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment.

In lieu of any of the foregoing orders or in addition thereto, the Court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the Court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

Earlier this year, in *Goldstein v. Denner*,[145] Vice Chancellor Laster adopted the federal courts' "step-by-step framework for analyzing spoliation issues[.]"[146] These steps are: (1) "whether the ESI 'should have been preserved;'" "whether the ESI 'is lost' and 'cannot be restored or replaced through additional discovery;" (3) "whether the ESI was lost 'because a party failed to take reasonable steps to preserve it;'" and (4) determining the appropriate sanction.[147] Given the similarities between Superior Court Civil Rule 37(b)(2)(F), Court of Chancery Rule 37(e), and Federal Rules of Civil Procedure Rule 37(e), this Court will also adopt that approach. The Court addresses each of these elements in turn.

---

[145] 310 A.3d 548 (Del. Ch. 2024).
[146] *Id.* at 571 (internal citations omitted).
[147] *See generally id.*

## IV.    ANALYSIS

### A.    The ESI from the Internal Forecasting Databases "Should Have Been Preserved."

The first question is whether ESI "should have been preserved."[148]   The Supreme Court of Delaware has held that "[a] party in litigation has an affirmative duty to preserve potentially relevant evidence."[149]   The duty to preserve begins as "as soon as the party either actually anticipates litigation or reasonably should have anticipated litigation."[150]   Whether a party "reasonably should have anticipated litigation" is an objective standard: it must be viewed from the perspective of the party in control of the evidence.[151]

Importantly, litigation need not be actually filed for a party to "reasonably anticipate" litigation.  "The reasonably foreseeable standard turns on the *prospect* of litigation, not the specific case or claims that ended up being filed."[152]  The duty to preserve includes evidence a party "knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a

---

[148] Del. Super. Ct. Civ. R. 37(b)(2)(F); *Goldstein*, 301 A.3d at 571–72.

[149] *Shawe v. Elting*, 157 A.3d 142, 150 (Del. 2017).

[150] *Goldstein*, 310 A.3d at 571 (internal citations omitted).

[151] *Id.* (internal citations omitted).  *See also* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery Second Edition* § 6.06[b], at 6-30–6-31 (2022) ("In light of this foreseeable risk [of needing to collect, review, and produce ESI], entities that might be parties to Delaware litigation can avoid significant disruption and expense by enacting data retention policies that will foster (relatively) inexpensive retrieval.") (internal citations omitted).

[152] *Goldstein*, 310 A.3d at 572 (emphasis added).

pending discovery request."[153] Once the duty to preserve evidence attaches, "the party 'must not destroy unique, relevant evidence that might be useful to an adversary.'"[154]

Huntsman had an affirmative duty to preserve relevant evidence regarding its internal forecasting data on November 4, 2019, when Dow served its Interrogatory requesting Huntsman describe "all methods [it] used to determine what amount of Product to take under the Agreement and the reasoning behind such methodologies and determinations."[155] Even looking at this through an objective lens—that of Huntsman's—Huntsman reasonably should have anticipated litigation regarding its internal forecasting data once it was served with Interrogatory No. 15.

Huntsman argues it was not under an obligation to preserve the ESI regarding internal forecasting until after Dow filed its Counterclaim on February 16, 2021 because "Huntsman did not know, and had no reason to believe, that its product forecasting might be relevant until Dow filed its Counterclaim."[156] This ignores the fact that the filing of litigation is just one—of many—ways that triggers a party's

---

[153] *In re Shawe & Elting LLC*, 2016 WL 3951339, at *16 (Del. Ch. July 20, 2016) (internal citations and quotations omitted). *See also* Wolfe & Pittenger, *supra* note 151, §6.06[b], at 6-30 ("In whatever way persons or entities address the aggregation, retention, and destruction of ESI in the ordinary course, they bear a duty to preserve potentially relevant ESI once they are subject to litigation or reasonably anticipate litigation.") (internal citations omitted).

[154] *Goldstein*, 310 A.3d at 572 (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003)).

[155] *See* Barr Decl. ¶ 3; *id.*, Ex. 1.

[156] Pls.' Opp'n at 18.

duty to preserve. A discovery request for product forecasting—no matter if Huntsman believed it was relevant at the time—triggered Huntsman's duty to preserve.

The Court also notes Huntsman's robust in-house litigation hold process, which it used for its own claims, but failed to use for Dow's. Huntsman uses an application called "TotalDiscovery" for its litigation hold process which "include[es] automating distribution of legal holds, reminders, and acknowledgements."[157] The litigation holds "are sent to persons identified by the in-house litigation team, IT Compliance (responsible for preserving Microsoft applications as well as other ESI), records management, and site records coordinators."[158]

Huntsman issued two litigation hold notices, on July 11, 2017 (before Huntsman filed this action on November 22, 2017) to seven custodians, and on December 6, 2017 to an additional ten custodians.[159] The fact that Huntsman issued a litigation hold notice *prior to* its own lawsuit belies any argument that Huntsman makes that it was not on notice of a potential claim regarding the internal forecasting data until Dow filed its Counterclaim.[160]

---

[157] *Id.* at 6.
[158] *Id.*
[159] *Id.* at 6–7.
[160] It is unclear to the Court what role, if any, Delaware counsel had in the preservation process. "At minimum, parties to Delaware litigation and their counsel are required to develop and oversee a preservation process." Wolfe & Pittenger, *supra* note 151, §6.06[b], at 6-32 (citing Guidelines to Help Lawyers Practice in the Court of Chancery, *available* at https://courts.delaware.gov/forms/download.aspx?id=99468 (last visited August 5, 2024)

Dow filed its Answer and Counterclaim on February 16, 2021. Despite the fact that Huntsman's internal processes "call for its litigation department to assess whether the counterclaim or cross-complaint" would require an additional litigation hold,[161] one was never issued for Dow's Counterclaim.

## B. The ESI is Largely Lost and Huntsman's Delayed Attempt to Recreate it does not Amount to it Being "Replaced."

The second issue is whether ESI is "lost" and "cannot be restored or replaced through additional discovery."[162] "Information is lost for purposes of Rule 37[(b)(2)(F)] only if it is irretrievable from another source, including other custodians."[163]

The Court finds the ESI regarding the Internal Forecasting Data is lost. Based on the record evidence for the Sanctions Motion, Huntsman knew as of June 2023 that it had destroyed internal forecasting data, but did nothing to attempt to recover it.[164] Instead, Huntsman sat on its hands for months—until the motion to compel hearing in January 2024—before it attempted to try to recover or recreate data from other locations.[165]

---

[hereinafter "Chancery Guidelines"], at 20). If Delaware counsel had been more involved with the preservation process, it is likely this entire motion could have been avoided.

[161] Pls.' Opp'n at 8.

[162] Del. Super. Ct. Civ. R. 37(b)(2)(F).

[163] *Goldstein*, 310 A.3d at 574.

[164] Scholnick Decl. ¶ 11 ("Huntsman responded that it produced all documents. What Huntsman meant was that it had produced all documents in its possession, custody, or control.").

[165] See Barr Decl. ¶¶ 20–42 for a detailed outline of the meet-and-confer process between the parties leading to the Motion to Compel heard on January 23, 2024.

Huntsman argues because it was able to recover some of the data from other locations (notably after the deadline for production), the ESI is not "lost."[166] This ignores the fact that it is impossible for anyone, including Huntsman, Dow, or the Court, to know exactly what information is still missing.[167] Also, critically, Huntsman concedes that Ms. Lozano's manual input of expected future purchases of Product from Dow in IBP-A is missing and lost.[168] This alone satisfies the "lost" element for spoliation.[169] Without Ms. Lozano's manual input (along with the other missing ESI), it is impossible for Dow to compare projections of purchases from Dow to the forecasts Dow received from Huntsman.

During the Sanctions Hearing, Huntsman's counsel offered additional depositions, at its expense, as a means of replacing the lost information.[170] Deposition testimony, however, is not a sufficient substitute in this action. Ms.

---

[166] *See generally* Pls.' Opp'n at 20–26.

[167] *See TR Invs., LLC v. Genger*, 2009 WL 4696062, at *16 (Del. Ch. Dec. 9, 2009) ("'[N]o harm, no foul' is not a cognizable defense to a contempt allegation."); *Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 235 (D. Minn. 2019) ("While it is true that Plaintiffs have obtained text messages that Boxill and other parties sent to or received from Staley and Wilson, that does not mean that all responsive text messages have been recovered or that a complete record of those conversations is available."); *Deerpoint Grp., Inc. v. Agrigenix, LLC*, 2022 WL 16551632, at *12 (E.D. Cal. Oct. 31, 2022) ("It is impossible to know now what ESI was available, but which is now no longer available."). Even counsel for Huntsman is not positive that it has produced all of the data it found: "Huntsman *believes* that it has found *almost* all of the data that would have provided inputs into IBP-A and that was used for forecasting." Scholnick Decl. ¶ 19 (emphasis added). *See also* Van Rinsum Decl. ¶ 3 ("I *believe* that these extracts [from WAVE] contain a complete set of sales upsides from April 13, 2016 to January 19, 2018." ) (emphasis added).

[168] Pls.' Opp'n at 12.

[169] *See Jonathan R. v. Justice*, 2024 WL 1339522, at *6 (S.D. W. Va. Mar. 28, 2024) (holding that defendants conceded "that some ESI was lost, satisfying this element.").

[170] Tr. 40:10–41:8.

Lozano has already been deposed twice in this action, where she testified that without Huntsman Internal Forecasting Data, she could not "fairly forecast Huntsman's intent to take product from Dow."[171]  Thus, any further deposition of Ms. Lozano (or anyone else) could not remedy the lost data.  Huntsman does not have all of the information it once did, and critically, Huntsman does not have all the data Ms. Lozano had when completing her forecasting on Huntsman's behalf.  When custodians cannot recall the details of information from ESI, depositions do not remedy the loss of evidence.[172]

## C. The ESI Was Lost Because Huntsman Failed to Take Reasonable Steps to Preserve It.

The next question is whether the ESI was lost "because a party failed to take reasonable steps to preserve it."[173]  "When a duty to preserve evidence arises, a party must act reasonably to preserve the information that it knows, or reasonably should know, could be relevant to the litigation, including what an opposing party is likely to request."[174]  Because ESI is "inherently more susceptible to loss or alternation," it is especially important to take the appropriate steps to preserve this information.[175]

---

[171] Barr Decl. Ex. 28, at 87:22–25.
[172] *Goldstein*, 310 A.3d at 575.
[173] Del. Super. Ct. Civ. R. 37(b)(2)(F).
[174] *Goldstein*, 310 A.3d at 576.
[175] Wolfe & Pittenger, *supra* note 151, § 6.06[b], at 6-31, citing Chancery Guidelines at 20, and *Beard Rsch. Inc. v. Kates*, 981 A.2d 1175, 1187 (Del. Ch. 2009) ("It is also well known that absent affirmative steps to preserve it, at least some electronically stored information . . . is likely to be lost during the course of litigation through routine business practices or otherwise.").

An important piece of preserving ESI is the issuance of a litigation hold to preserve relevant documents once a party reasonably anticipates litigation. Once an organization issues a litigation hold, it must also "take steps to ensure that the recipients of the hold understand what it means and abide by it."[176] "The organization also must suspend or modify routine document retention or document destruction policies so that evidence is not lost."[177]

There is no dispute Huntsman did not take reasonable steps to preserve the Internal Forecasting Data in this litigation. According to Huntsman, "[t]his was the result of inadvertence and oversight by Huntsman."[178] In a rare mea culpa, Huntsman's General Counsel, David Stryker, admitted: "My guys made a mistake and they're paying a price for it."[179] More striking to the Court, however, is the fact that despite Huntsman's acknowledgement that it made a "mistake" in not issuing a litigation hold notice regarding the Counterclaims, Huntsman *to this day* has still failed to issue a litigation hold notice. That means that information continues to be lost and/or destroyed, and Huntsman is doing nothing about it.[180]

---

[176] *Goldstein*, 310 A.3d at 577 (internal citations omitted).
[177] *Id.* (internal citations omitted).
[178] Pls.' Opp'n at 9.
[179] Scholnick Decl. Ex. 31, at 96:13–14. Similarly, Huntsman's lawyer stated at the Sanctions Hearing: "Huntsman failed to issue a litigation hold following its receipt of the counterclaim. It's regrettable. I apologize to the Court and to Dow for that lapse. This has made our case way more difficult than it should have been had we issued the hold because we wouldn't have been – we would not be in this situation today." Tr. 33:17–34:2.
[180] *See Zubulake*, 220 F.R.D. at 218 (A party generally "must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of

Also troubling to the Court is that Huntsman knew that the Internal Forecasting Data had been deleted in June 2023, but did not inform Dow.[181] In a carefully worded affidavit from Huntsman's counsel submitted in connection with Huntsman's Opposition, Huntsman's counsel averred:

> On or around May 25, 2023, Dow served a Sixth Set of Requests for Production, including Request No. 78, which asked for all documents referenced in Huntsman's responses to Interrogatory No. 15. On June 26, 2023, Huntsman responded that it produced all documents. What Huntsman meant was that it had produced all documents in its possession, custody, or control.[182]

relevant documents."); *In re Skanska USA Civil Southeast Inc.*, 340 F.R.D 180, 185 (N.D. Fl. 2021) ("This is a text book case of spoliation . . . Despite anticipating litigation, despite issuing a written litigation hold on October 14, 2020, despite Claimants filing their first suit in November 2020, and despite receiving discovery requests in April 2021, Skanska failed to suspend its normal document destruction procedures, failed to collect cell phone data from key custodians, failed to ensure its employees understood the litigation hold, and failed to take any steps to prevent the destruction of cell phone data.").

[181] Tr. 13:5–11. On June 26, 2023, Huntsman served its responses to Dow's Sixth Set of Requests for Production wherein Huntsman stated it had "produced responsive, non-privileged documents from 2015 through 2020 that were considered or relied upon for the purpose of determining how much Product to include in its quarterly forecasts[.]" Barr Decl. ¶ 20. Huntsman in that response did not indicate that it had withheld any responsive documents. As late as November 7, 2023, Huntsman indicated to Dow that Huntsman was "undertaking efforts to recover and/or locate the ESI from its ESOPT, [FuturCast], and/or Wave platforms." *Id.* ¶ 27; *id.*, Ex. 15. While it is not specifically admitted by any Huntsman representative, Mr. Scholnick's strategically worded qualification of Huntsman's responses to Interrogatory No. 15 that Huntsman "meant" to say "it had produced all documents in its possession, custody, or control" indicates to the Court that at that point Huntsman was at the very least aware that it did not have the requested documents in its "possession, custody, or control," but failed to indicate that fact to either Dow or the Court. *See* Scholnick Decl. ¶ 11. Mr. Scholnick did detail the efforts to find and retrieve the information requested by Interrogatory 15, but he notably failed to indicate the dates in which these efforts began, only noting that the IBP-A license was renewed "in or around November 2023." *See id.* ¶¶ 17–19, 21, 26, 27. Ms. Lozano was directed in October of 2023 to find "underlying data" demonstrating that Huntsman first sought Ms. Lozano's help in retrieving the documents in October 2023. *See* Lozano Decl. ¶¶ 6, 27. Ms. Lozano continued searching for documents and underlying data at least as late as March 2024. *Id.* ¶¶ 12, 14, 15, 29, 30.

[182] Scholnick Decl. ¶ 11.

As such, it appears to the Court that Huntsman deliberately withheld this information in an attempt to either hide the information from Dow completely (and hope they would not find out), or put off Dow's discovery of the lost data. Only after Dow moved to compel, and after the Court granted the Dow's motion to compel in January 2024 did Huntsman meaningfully attempt to recover or re-create the databases and begin dripping out documents. Such lack of candor to opposing counsel and the Court is troubling.

## D. Determining the Appropriate Sanction

The final issue is the determination of the appropriate sanction. Superior Court Civil Rule 37(b)(2)(F) governs the Court's analysis.[183]

### 1. *Dow Has Suffered Prejudice.*

The Court finds that Dow has suffered prejudice as a result of Huntsman's actions. Unavoidable is the initial fact that once Huntsman learned it had destroyed, deleted, or otherwise lost documents relevant to Interrogatory 15, it failed to disclose this to Dow or the Court until months later. The Court deduces from the record available that by June of 2023 at least, if not months before, Huntsman was aware of the missing documents.[184] Huntsman not only hid the fact that it lost data files,

---

[183] *BDO USA, LLC v. EverGlade Glob., Inc.*, 2023 WL 1371097, at *13–14 (Del. Super. Jan. 31, 2023).

[184] See *supra* note 181 detailing the Court's interpretation of when Huntsman first *knew* the materials were lost.

but, once some of those files were recovered, delayed in producing the information over the course of several months, as late as April of 2024 when the parties are set to go to trial in September of 2024. Not only is this clearly delayed in anticipation of trial and after the agreed-to document discovery deadline, but it was after the Court ordered Huntsman to disclose the relevant documents within a week of the January 2024 motion to compel hearing.[185] Even at the Sanctions Hearing, counsel for Huntsman could not definitively say that all the documents or data that can be found, has been found.[186]

No matter how apologetic Huntsman's counsel may be, there is still no litigation hold notice issued—something the Court can only read as a continued disregard for the harm this has and continues to cause to Dow. Even if Huntsman is convinced it has recovered and disclosed all it can, Huntsman is aware of auto-delete functions on its applications, and has a responsibility to issue a litigation hold and to stop the auto-delete, even if it were to produce no additional documents.

Huntsman instead offers to pay for additional depositions to explain the data they have produced, but as case law, and the record indicates, even if the majority of the information has been recovered and can be detailed by a deponent, Dow has no way of knowing how much is still missing, and if that missing information is key to

---

[185] *See supra* Section II. E.
[186] Tr. 45:15–23 ("I'm under a total obligation to supplement the discovery responses *if and when* I ever find any more.") (emphasis added).

43

the Counterclaim. There is simply no way to cure the loss of information, especially when the company that lost the information is not even sure of the substance of what is still unrecovered.

Huntsman's actions, omissions and delays have resulted in Dow's inability to prepare for trial in less than a month from the date of this decision. As noted by Dow in the Sanctions Hearing: "[W]hat about Dow? What about the fact that Dow got the runaround for years on this information? What about the fact that Dow had to move to compel over and over to get to the bottom of this?"[187] The Court cannot ignore that Dow has suffered not only the time and costs of litigating the issue of spoilation, but the ability to sufficiently prepare its Counterclaim in advance of trial.

### 2. Huntsman Acted Recklessly When It Destroyed the Internal Forecasting Data.

"As a predicate to a sanction of default judgment, Rule 37(b) requires that the court make a finding concerning the offending party's state of mind."[188] Default judgment is "the ultimate sanction for discovery violations and should be used sparingly."[189] Thus, if lesser sanctions would achieve the same result, default judgment is inappropriate.[190] Such lesser sanctions include the presumption "that

---

[187] Tr. 66:7–15.
[188] *BDO USA*, 2023 WL 1371097, at *14.
[189] *Lehman Cap. v. Lofland*, 906 A.2d 122, 131 (Del. 2006) (internal quotations omitted).
[190] *Beard Rsch.*, 981 A.2d at 1190 (internal citations omitted).

the lost information was unfavorable to the party," or a jury instruction that "the jury . . . may or must presume the information was unfavorable to the party[.]"[191]

Here, the Court finds that the line between whether Huntsman's conduct was intentional or reckless is very difficult to draw. On the one hand, Huntsman intentionally destroyed Internal Forecasting data relevant to this dispute.[192] Most egregiously, Ms. Lozano specifically directed data from IBP-A to be destroyed because it was no longer in use. On the other hand, it does not appear to the Court that Huntsman destroyed the Internal Forecasting data in order to limit the information Dow would have in this litigation.[193]

The Court does find that Huntsman's conduct was reckless. The Delaware Pattern Jury Instructions for Civil Practice provides that "[r]eckless conduct reflects a knowing disregard of a substantial and unjustifiable risk. It amounts to an 'I don't care' attitude."[194] Recklessness also involves a "conscious indifference of others," and requires: "(1) an act; and (2) the foreseeability of harm resulting from the act

---

[191] Del. Super. Ct. Civ. R. 37(b)(2)(F)(2).

[192] *See Urb. Concepts LLC v. Gruber*, 2023 WL 4423978, at *4 (Del. Super. July 7, 2023) ("Intentional conduct means conduct that a person undertook with a knowing desire or with a conscious objective or purpose.") (internal quotations omitted); *State ex rel. Jennings v. Concrete Tech. Resurfacing & Design, Inc.*, 2022 WL 6609883, at *7 (Del. Super. Oct. 10, 2022) ("Intentional destruction means the spoliator acted 'with purpose.'") (internal citations omitted).

[193] *See TR Invs.*, 2009 WL 4696062, at *17 ("[T]o obtain an adverse inference, the aggrieved party must make some showing that the allegedly destroyed evidence existed and supported the aggrieved party's position.").

[194] Del. P.J.I. Civ. § 5.9.

that the actor perceived or should have perceived."[195]  Therefore, "drawing an adverse inference is appropriate when an actor is under a duty to preserve evidence and takes part in the destruction of evidence while being consciously aware of a risk that he or she will cause or allow evidence to be spoiled by action or inaction and that risk would be deemed substantial and unjustifiable by a reasonable person."[196]

Huntsman is a highly sophisticated company with a detailed process in place for litigation holds.  Huntsman had a process for issuing a litigation hold which included a required "acknowledgement" of the hold via a questionnaire, and requirements on Huntsman's lawyers to follow up on those who failed to complete the questionnaire.  Huntsman additionally had processes to manage its internal databases and preserve information, even for databases with an auto-delete function.[197]  Dow relied on Huntsman's sophistication "contrasted with its lack of effort to preserve Huntsman Internal Forecasting Data" as evidence of intent.[198]  Huntsman's own General Counsel, David Stryker, indicated that Huntsman has "lots of lawsuits and [has] lots of legal holds."[199]  Huntsman detailed in its own briefing

---

[195] *Urb. Concepts*, 2023 WL 4423978, at *4 (internal quotations omitted).
[196] *Beard Rsch.*, 981 A.2d at 1192.
[197] *See* Defs.' Br. at 16–17 (internal citations omitted).
[198] *Id.* at 25.  *See also* Tr. 27:12–19 ("We also think you should take into account that Huntsman's a large, sophisticated corporation.  It's a legal department that's been involved in many, many litigations.  It has robust practices, but it didn't follow them here for reasons that no one seems to be able to explain.  We think that makes the fact that they never sent a hold notice even more egregious.").
[199] Barr. Decl. Ex. 32, at 105:21–24.

in opposition that its in-house litigation team, IT Compliance, is "responsible for preserving Microsoft applications as well as other ESI[.]"[200] Huntsman additionally detailed that its own processes dictate that when a counterclaim or cross-claim is received the litigation department must "assess" if the new filing "requires the identification of additional custodians and additional preservation efforts; if both answers are 'yes,' a new legal hold will be issued."[201]

Huntsman issued two litigation holds for its own affirmative claims, but did not issue a litigation hold for the Counterclaim. If this was the only failure on Huntsman's part, the Court may consider it to be negligent or a "mistake," to take Huntsman's general counsel's words. But it was not. The following non-exhaustive

---

[200] Pls.' Opp'n at 6.

[201] *Id.* at 8 (internal citations omitted). Huntsman attempts to distinguish from Dow's reliance on *Pajak v. Under Armour, Inc.*, 2023 WL 2755927 (N.D.W. Va. Mar. 31, 2023) by noting that there, the data was deleted by someone who had *actual* notice of the hold, whereas here, despite being a sophisticated, large corporation with a legal department, none of the persons deleting the information had actual notice because of the mistake in failing to issue the hold. *Id.* at 40. Dow argues that the legal team's mistake does not distinguish *Pajak*'s emphasis on holding sophisticated corporation's accountable, and thus, the failure by the sophisticated legal team to issue the hold is circumstantial evidence of intent. Defs.' Reply at 20–21. The Court agrees. Mr. Scholnick acknowledged Huntsman's willingness and ability to issue litigation holds without sufficiently explaining why the Counterclaim hold never happened, outside of a "mistake." *See* Tr. 53:10–18 ("[Y]ou can see that we weren't afraid to issue holds, perfectly happy to issue holds. Wish we had. Had a procedure in place for issuing holds as testified to by Mr. Stryker as the general counsel. Your Honor, I wish we had issued a hold because I would have been happy to have avoided all this stuff that we're doing now if we had gotten a hold out."); 59:10-15 ("I don't think there's been any testimony to the fact that we turned a blind eye to it. We made a mistake and the general counsel of Huntsman has testified about the fact that this was a mistake. Monumental mistake, sure, but a mistake, not intending to hide any information.").

list demonstrates that Huntsman's conduct and failure to preserve the Internal Forecasting Data was reckless:

- Huntsman has never sent a litigation hold notice for the Counterclaim;

- Huntsman consistently pushed back at each step of this litigation—from the first discovery request in 2019 through the beginning of this year—to avoid producing information from the Internal Forecasting Databases;

- Huntsman had a rolling auto deletion functionality in databases that has never been turned off;

- Lauren Lozano approved the deletion of IBP-A data on September 14, 2021, saying Huntsman was "not using IBP-A and the data did not need to be retained;"[202]

- Huntsman's internal legal department and outside counsel knew litigation was ongoing with numerous discovery disputes, but allowed the Internal Forecasting Data to be deleted;

- In June 2023, when Huntsman responded to Dow's document requests regarding the Internal Forecasting Data documents, Huntsman misrepresented that "all" documents had been produced; and

---

[202] Lozano Decl. ¶ 32.

- After Dow finally became aware of the deleted Databases, *only then* did Huntsman try to do damage control and re-create or attempt to find deleted databases.

The Court finds that the appropriate remedy for Huntsman's conduct is drawing an adverse inference. Because this action is a bench trial, the Court will presume, during trial, that the lost information was unfavorable to Huntsman.[203] The Court will also not permit Huntsman to use any of the documents produced after the Court's deadline in January 2024 related to the Internal Forecasting Data.[204] As noted by Dow, failing to meet the discovery deadlines prevented Dow from being able to question witnesses about the documents belatedly disclosed.[205] A deposition, as Huntsman suggests, at this point would either force Dow to proceed to trial unprepared, or force this Court to push the trial date on a case that has been pending since 2017—two outcomes that are both inappropriate to attempt to rectify the parties' disregard for the Court's deadlines. This Court has authority to issue sanctions for both a punitive and deterrent purpose,[206] and both are relevant here. To allow Huntsman to rely on the documents produced after the Court's deadline would

---

[203] *See, e.g.*, *Goldstein*, 301 A.3d at 585–86 (imposing a sanction of a presumption that the lost information would have favored the moving party's position).
[204] *See Huntsman v. Dow*, C.A. No. N17C-11-242 CCLD, Motion to Compel (Del. Super. Jan. 23, 2024) Tr. at 61:7–13 (requiring production on the date of the hearing, or at the latest, by the end of that week).
[205] Defs.' Reply at 5.
[206] *See, e.g.*, *In re Rinehardt*, 575 A.2d 1079, 1082 (Del. 1990) (internal citations omitted).

49

reward their failure to follow Court rules—the Court declines to do so. Preventing Huntsman's reliance on the newly produced documents is necessary to cure the prejudice incurred from Huntsman's conduct.[207]

### 3. *Attorneys' Fees*

Pursuant to Superior Court Civil Rule 37(b)(2)(F), the Court finds that Dow is entitled to its attorney's fees in prosecution of the Motion for Sanctions.[208] Spoliation of evidence is an "obvious" example of bad faith conduct which merits fee shifting.[209] Dow shall prepare an affidavit in connection with Superior Court Civil Rule 37(b)(2)(F) regarding its attorney's fees within two weeks and submit to the Court for its approval.

## V.    CONCLUSION

Huntsman's reckless conduct has put Dow in the unfortunate position of facing a trial by surprise—a situation not appropriate in civil trials, even those conducted as a bench trial. Huntsman had an obligation to preserve ESI at the latest by November 2019 upon receipt of Interrogatory 15, but failed to engage in any efforts to preserve the information. Huntsman further failed to disclose timely the

---

[207] *See, e.g.*, *Goldstein*, 310 A.3d at 587 (noting that imposing a sanction must be necessary to cure the prejudice caused).

[208] *See, e.g.*, *BDO USA*, 2023 WL 1371097, at *16–17 (awarding reasonable attorneys' fees and costs incurred in connection with the motion for sanctions, related motions to compel, and all other related discovery processes implicated by the spoliated evidence); *Goldstein*, 310 A.3d at 587 (awarding reasonable attorneys' fees incurred in "pursuing the spoliation issue").

[209] *BDO USA*, 2023 WL 1371097, at *16.

failure to preserve the information to both Dow and the Court, and substantially delayed in seeking to recover the lost and destroyed information. The Court therefore **GRANTS** Dow's Motion for Sanctions for Spoliation Against Huntsman, awarding Dow an adverse inference as to the lost information, prohibiting Huntsman from relying on documents produced after the Court's January 2024 deadline, and awarding attorneys' fees incurred by Dow in pursuing these issues.

      **IT IS SO ORDERED.**

/s/ Meghan A. Adams

**Meghan A. Adams, Judge**